# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>JULIO GABRIEL DIAZ | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br><br>SA11-636M |

Complaint for violation of Title 21 U.S.C. § 841(a)(1).

| NAME OF MAGISTRATE JUDGE<br>JEAN P. ROSENBLUTH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Santa Ana, CA |
|---|---|---|

| DATE OF OFFENSE<br>March 2008 to present. | PLACE OF OFFENSE<br>Orange County and<br>Santa Barbara County. | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

See attached affidavit which is incorporated as part of this Complaint.



FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

DEC 29 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

LODGED

DEC 29 PM 3:23
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>MARC A.K. MARSHALL |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Drug Enforcement Agency (DEA) |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>JEAN P. ROSENBLUTH | DATE<br><br>December 29, 2011 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

ALW:lb       REC: [Detention]

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

I.     TRAINING AND EXPERIENCE   . . . . . . . . . . . . . . . . 1

II.    PURPOSE OF AFFIDAVIT . . . . . . . . . . . . . . . . . . 3

       A.   Target of the Investigation . . . . . . . . . . . . 4

III.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . 6

       A.   Overview of the Law and Policy Regarding
            Prescription Medication . . . . . . . . . . . . . . 6

       B.   The Controlled Substances in this Investigation . . 10

IV.    PROBABLE CAUSE . . . . . . . . . . . . . . . . . . . . . 14

       A.   Initiation of Investigation . . . . . . . . . . . 14

            1.   Referrals to the Medical Board of
                 California . . . . . . . . . . . . . . . . . . 14

            2.   Medical Board Investigator's Unannounced
                 Visit to DIAZ's Medical Clinic . . . . . . . . 22

            3.   Interview of DIAZ by Medical Board Investigator 23

       B.   Interviews with Medical Personnel at Cottage
            Hospital   . . . . . . . . . . . . . . . . . . . . 25

       C.   Pharmacist Interviews . . . . . . . . . . . . . . 37

       D.   Overdose Deaths Associated with DIAZ  . . . . . . . 43

       E.   Investigation of DIAZ by Anthem Blue Cross
            Insurance . . . . . . . . . . . . . . . . . . . . 56

       F.   Interview of Former Employee Angelica Magana. . . . 58

       G.   Arrest and Citation of DIAZ Patients L.R. and
            K.D.  . . . . . . . . . . . . . . . . . . . . . . 64

       H.   Expert Review of DIAZ's CURES Report  . . . . . . . 65

       I.   My Examination of DIAZ's CURES Data . . . . . . . . 74

V.     CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . 75

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, MARC A.K. MARSHALL, being duly sworn, hereby declare and say as follows:

### I.

### TRAINING AND EXPERIENCE

1. I am a Special Agent ("SA") for the United States Drug Enforcement Administration ("DEA"). I have been employed full-time by the DEA since January 2006 and am currently assigned to the Los Angeles Field Division ("LAFD"), Tactical Diversion Squad ("TDS"). The TDS is a task force that investigates the diversion of pharmaceuticals and is comprised of Special Agents and Diversion Investigators from the DEA.

2. Before my employment with the DEA, I was a police officer for two years, serving with the Johnson City Police Department in Johnson City, Tennessee. I made several drug-related arrests stemming from traffic stops and proactive police work from public contact.

3. During my tenure with the DEA, I have received in excess of 400 hours of formal training in the manufacture, packaging, and sales of controlled substances. These formal classes have been predominately sponsored by the DEA and the California Department of Justice using certified experts on the functioning of both large and small drug trafficking

1

organizations.

4.   As a SA assigned to TDS, I am responsible for
investigating the illegal diversion of controlled substances and
listed chemicals from legitimate medical, scientific, and
industrial channels.  In that capacity, I have participated in
investigations of registered practitioners, such as medical
doctors, pharmacists, regulated persons, and others involved in
a variety of violations, including health care fraud, bank
fraud, money laundering, and drug-related offenses.  I have
become familiar with patient charts, the common components of a
patient chart, and standard operating practices that are common
among medical entities.  I have also conferred with other
investigators who have participated in numerous investigations
and prosecutions of health care fraud.  I have also received
training from the DEA in the investigation of drug diversion
cases, which involve persons who divert legitimate prescription
medications and List I Chemicals from legitimate medical use.
These types of drugs include OxyContin (oxycodone), Xanax
(alprazolam), Valium (diazepam), Percocet (oxycodone), Norco
(hydrocodone), Gamma Hydroxybutyric Acid, anabolic steroids, raw
steroid powders, human growth hormones, listed chemical Gamma
Butyrolactone, and other highly addictive medications.  During
these investigations, I have utilized various investigative

2

techniques, such as physical surveillance, body wires, and search warrants. I have been involved in over 15 major drug investigations, some of which involved Title III investigations that resulted in the seizure of over five hundred kilograms of controlled substances and over 10 million dollars in drug-related proceeds. Additionally, these investigations targeted illegal drug traffickers on an international level, including smugglers, financiers, transporters, and top-level distributors. I have become aware of the techniques used by distributors that attempt to avoid detection by U.S. law enforcement authorities, such as using multiple locations to send and receive illegal drugs and drug-related proceeds, multiple vehicles, cellular telephones, computers, and the use of numerous associates to assist them. In addition, I am familiar with the U.S. Code of Federal Regulations 21, Part 1300 to End, Food and Drugs, and federal laws pursuant to which such crimes are prosecuted.

## II.

### PURPOSE OF AFFIDAVIT

5. This affidavit is made in support of a criminal complaint against, and a warrant for the arrest of, Julio Gabriel DIAZ ("DIAZ"), for distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1).

6. This affidavit is intended to show that there is

3

sufficient probable cause for the requested complaint.  This
affidavit is not intended to be a complete statement of all
known information of evidentiary value, and it does not purport
to set forth all of my knowledge of, or investigation into, this
matter.  This affidavit is based on personal knowledge that I
have gained from my participation in this investigation, as well
as information from the following sources, among others:

     a.   Oral and written reports and other supportive
documentation about this investigation, which I have
received from other federal agents and other law
enforcement agencies, as well as conversations with such
law enforcement officers and agents;

     b.   Physical surveillance conducted by federal agents
or local law enforcement agencies, which has been reported
to me either directly or indirectly; and

     c.   Information provided by doctors, pharmacists,
former patients, and other sources of information.

## A.  Target of the Investigation

7.  According to DMV records, DIAZ is a male, 63 years of
age, approximately 5'7" in height and 175 pounds in weight, with
brown hair and blue eyes.  DIAZ is a medical doctor currently
licensed by the State of California.  I have investigated DIAZ's
registration and licensing records with DEA and the Medical

4

Board of California and have learned the following:

      a.   DIAZ's California Medical License is currently listed as "license renewed and current" and expires on June 30, 2013. According to the online Medical Board of California website, DIAZ's specialties are general practice, pathology, and geriatrics. I found no indication of a pain management practice on any online doctor websites that reference DIAZ's practice.

      b.   DIAZ currently maintains DEA registration AD1429592, which is required for ordering, prescribing, administering, and/or dispensing controlled substances.

      c.   DIAZ operates a clinic in Santa Barbara, California. As set forth further below, based on evidence obtained in this investigation, there is probable cause to believe that DIAZ has written prescriptions for large quantities of controlled substances that are not medically necessary or indicated. As a result, highly addictive prescription controlled substances, including oxycodone and hydrocodone, have been diverted from legitimate medical use into the community for an illegitimate use.

## III.

### BACKGROUND

## A. Overview of the Law and Policy Regarding Prescription Medication

8. Based on my training and experience, I know that the distribution of controlled substances must meet certain federal rules and regulations. Specifically, I know the following:

a. Title 21 U.S.C. § 812 establishes schedules for controlled substances which present a potential for abuse and the likelihood that abuse of the drug could lead to physical or psychological dependence on that drug. Such controlled substances, including pharmaceuticals, are listed in Schedule I through Schedule V, depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence.

b. Pursuant to Title 21 U.S.C. § 822, controlled substances may only be prescribed, dispensed, or distributed by those persons who are registered to do so with the Attorney General of the United States (with some exceptions, such as delivery persons). The Attorney General has delegated authority to register persons to the DEA.

c. Title 21 C.F.R. § 1306.04 sets forth the

6

requirements for a valid prescription.  It provides that a "prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his practice.  The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."  (Emphasis added.)

     d.    21 C.F.R. § 1306.12 governs the issuance of multiple prescriptions and states:  "An individual practitioner may issue multiple prescriptions authorizing the patient to receive a total of up to a 90-day supply of a Schedule II controlled substance provided the following conditions are met:

     i.    Each separate prescription is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice;

     ii.    The individual practitioner provides written instructions on each prescription (other than the first prescription, if the prescribing practitioner intends for that prescription to be filled

7

immediately) indicating the earliest date on which a
pharmacy may fill each prescription;

   iii.    The individual practitioner concludes that
providing the patient with multiple prescriptions in
this manner does not create an undue risk of diversion
or abuse;

   iv.    The issuance of multiple prescriptions as
described in this section is permissible under the
applicable state laws; and

   v.    The individual practitioner complies fully
with all other applicable requirements as well as any
additional requirements under state law."

   e.    21 U.S.C. § 841(a)(1) makes it an offense for any
person to knowingly or intentionally distribute or dispense
a controlled substance except as authorized by law.  A
physician violates Section 841(a)(1) when the physician
knowingly and intentionally prescribes a controlled
substance for other than a legitimate medical purpose and
outside of "the usual course of professional practice."
See United States v. Moore, 423 U.S. 122, 124 (1975) ("We
. . . hold that registered physicians can be prosecuted
under 21 U.S.C. § 841 when their activities fall outside
the usual course of professional practice."); see also

8

United States v. Feingold, 454 F.3d 1001, 1008 (9th Cir.
2006) ("[T]o convict a practitioner under § 841(a), the
government must prove (1) that the practitioner distributed
controlled substances, (2) that the distribution of those
controlled substances was outside the usual course of
professional practice and without a legitimate medical
purpose, and (3) that the practitioner acted with intent to
distribute the drugs and with intent to distribute them
outside the course of professional practice.").

      f.    The Medical Board of California formally
adopted a policy statement entitled "Prescribing Controlled
Substances for Pain."  The Medical Board's guidelines state
that a medical history and physical examination must be
accomplished, which includes an assessment of the pain and
physical and psychological function; a substance abuse
history; a history of prior pain treatment; an assessment
of underlying or coexisting diseases and conditions; and
documentation of the presence of a recorded indication for
the use of a controlled substance.

      g.    California Business and Professions Code, Section
2242, states that there must be a logical connection
between the medical diagnosis and the controlled substance
prescribed:  "Prescribing, dispensing, or furnishing

dangerous drugs as defined in Section 4022 without a good
faith prior examination and medical indication therefore,
constitutes unprofessional conduct." A good faith
examination is defined as an honest effort to prescribe for
a patient's condition in accordance with the standard of
medical practice generally recognized and accepted in the
country.

## B.   The Controlled Substances in this Investigation

9.   Opioid pain relievers are the most commonly
diverted/abused pharmaceuticals because of the euphoria they
induce.  Opioid pain relievers include codeine, fentanyl,
hydromorphone, morphine, oxycodone, methadone, and hydrocodone,
to name a few.  The controlled substances most mentioned in this
affidavit are described in more detail below:

a.   Oxycodone is a generic name for a narcotic
analgesic classified under federal law as a Schedule II
narcotic drug controlled substance.  Oxycodone, when
legally prescribed for a legitimate medical purpose, is
typically used for the relief of moderate to severe pain.
It can be habit forming.  An oxycodone prescription is
generally issued for a modest number of pills to be taken
over a short period of time.  Oxycodone is also known by
its brand names, particularly Oxycontin, and is a commonly

10

abused controlled substance that is diverted from
legitimate medical channels.  Oxycodone and Oxycontin are
formulated in extended release strengths of 10mg, 15mg,
20mg, 30mg, 40mg, 60mg, and 80mg per tablet.  Oxycodone is
also formulated in an oxycodone/acetaminophen combination
that is known by the brand name Percocet.  Percocet
typically has a street value of $1.00-$5.00 per 5mg tablet.
Oxycodone typically has a street value of $20.00 to $40.00
per 80mg tablet.  Oxycontin, being a brand name, typically
brings a higher street value.

     b.   Hydrocodone is a generic name for a narcotic
analgesic classified under federal law as a Schedule III
narcotic drug controlled substance.  Hydrocodone, when
legally prescribed for a legitimate medical purpose, is
typically used for the relief of mild to moderate pain.
Accordingly, the prescription is generally for a modest
number of pills to be taken over a short period of time.
Hydrocodone is also known by its brand names Vicodin,
Norco, and Lortab, and is a commonly abused controlled
substance that is diverted from legitimate medical
channels.  Hydrocodone is formulated in combinations of 5-
10mg of hydrocodone and 325-750mg of acetaminophen.
Hydrocodone typically has a street value of $1.00 - $3.00

11

per tablet regardless of strength.

     c.   Fentanyl is a generic name for a semi-synthetic opioid narcotic analgesic classified under federal law as a Schedule II narcotic drug controlled substance.  Fentanyl is a commonly abused controlled substance that is diverted from legitimate medical channels.  Fentanyl has been approved for use for anesthesia and analgesia, most often in the operating room and intensive care unit.  Fentanyl is often used in cancer therapy and other chronic pain management due to its effectiveness in relieving pain. Fentanyl has an extremely high potential for abuse, addiction, and the development of tolerance.

     d.   Methadone is a generic name for a synthetic opioid narcotic analgesic classified under federal law as a Schedule II narcotic drug controlled substance.  Although chemically unlike oxycodone or heroin, methadone also acts on the opioid receptors and thus produces many of the same effects.  Methadone is also used in managing chronic pain due to its long duration of action and very low cost. Methadone's usefulness in treatment of opioid dependence is the result of several factors.  It has cross-tolerance with other opioids, including heroin and morphine, and a long duration of effect, with the result that oral dosing with

methadone will stop the opioid withdrawal syndrome.  It
also blocks the euphoric effects of heroin, morphine, and
similar drugs.  As a result, properly dosed methadone
patients can reduce or stop altogether their use or abuse
of these substances.  Methadone typically has a street
value of $10.00 per tablet.

     e.   Buprenorphine is a generic name for a semi-
synthetic opioid narcotic analgesic classified under
federal law as a Schedule III narcotic drug controlled
substance.  Depending on the application form,
buprenorphine is indicated for the treatment of moderate to
severe chronic pain.  Buprenorphine sublingual preparations
are often used in the management of opioid dependence (that
is, dependence on heroin, oxycodone, hydrocodone, morphine,
fentanyl, or other opioids).  Buprenorphine sublingual
tablets (Suboxone and Subutex for opioid addiction) have a
long duration of action which may allow for dosing every
two or three days, as tolerated by the patient, compared
with the daily dosing (some patients receive twice daily
dosing) required to prevent withdrawals with methadone.

     f.   Alprazolam is a generic name for a Schedule IV
benzodiazepine prescription drug that, when used for a
legitimate medical purpose, is used to treat such

13

conditions as anxiety, depression, and panic disorder.
Alprazolam is marketed under the brand name Xanax, which is
a commonly abused controlled substance that is diverted
from legitimate medical channels.  Xanax typically has a
street value of $1.00 per tablet.  A prescription for 100
tablets of alprazolam can earn the street dealer a profit
of $100.00 for each bottle of 100 tablets.  The dealer's
profit multiplies when the dealer obtains several
prescriptions at a time for this controlled substance.

                              IV.

                       **PROBABLE CAUSE**

**A.   Initiation of Investigation**

   **1.   Referrals to the Medical Board of California**

   Cottage Hospital Physicians

        10.   In a letter dated October 26, 2009, three medical
doctors and a registered nurse with Santa Barbara Cottage
Hospital ("Cottage Hospital") notified the Medical Board of
California (the "Medical Board") as follows:

        To Whom It May Concern,

        We are mental health professionals who work on the
        inpatient psychiatric program at Cottage Hospital in Santa
        Barbara, California.  We treat patients with substance
        abuse disorders and would like to register a concern with
        the prescribing patterns of one of the physicians in the
        area, Dr. Julio DIAZ (License # A36932).  Dr. DIAZ
        practices at the Family Care Clinic, 510 N. Milpas Street,

                              14

Santa Barbara, California, 93103.  We have seen several
patients who became addicted to large doses of narcotics
prescribed by Dr. DIAZ, and know of one fatality associated
with overdose of narcotics prescribed by Dr. DIAZ.  We see
at least one patient a month who is admitted for
detoxification from excessively high doses of narcotics
after seeing Dr. DIAZ.  He is often described as a "Doctor
you can get anything from" by patients.  For example, a
recent patient was prescribed 120- Oxycontin 40 mg tablets,
150 methadone 10 mg tablets, 120- 2 mg fentanyl tablets,
and 120 2 mg Xanax tablets in a single month for treatment
of menstrual cramps.  We have previously raised concerns
with the Medical Board regarding Dr. DIAZ's prescribing
practices but are corresponding again because we continue
to see patients who have become addicted under his care.

DIAZ Patient C.S.

11.  On September 21, 2009, the Medical Board received a

complaint from R.S. concerning his son, C.S. (who, at the time,

was 20 years old).  In the complaint, R.S. stated:

> I just returned from an all night vigil in the emergency
> room.  My son was brought there for a drug overdose.  He
> stopped breathing a few times and was in a very serious
> state.  It has since been brought to my attention that Dr.
> DIAZ has been prescribing him HUGE quantities of
> medication.  He doesn't have any medical conditions that
> would warrant this type of prescribing.  I searched his
> room and found three scripts written by Dr. DIAZ on the
> same day for:
>     A) Oxycontin, 40MG tabs, quantity 60
>     B) Hydromorphone, 8MG tabs, quantity 60
>     C) Alprazolam, 2MG tabs, quantity 60
> It has also come to my attention that a friend of his,
> J.L., died April 7th, 2009, of an overdose right after
> getting scripts from Dr. DIAZ.  In talking to some people
> it is well known that you can go to this doctor and get a
> script if you bring cash.

12.  On December 10, 2009, SA Nicholas Priymak and

15

Diversion Investigator ("DI") Cheryl Harlig went to R.S.'s
residence, where they interviewed C.S. and his mother, Mrs. S.
Mrs. S. said that her son, C.S., moved to his own place during
the summer of 2009 for approximately three weeks.  During this
time, C.S. overdosed on drugs that he received after filling
prescriptions written by DIAZ.  Mrs. S. said that C.S. was on
the road to recovery but had suffered one relapse.

13.  SA Priymak and DI Harlig then interviewed C.S., who
told them the following:  At a Halloween party in 2008, C.S. was
arrested for being drunk in public.  Someone in jail told C.S.
about DIAZ.  C.S. had been in a car accident a few years prior
and had since suffered back pain.  C.S. went to DIAZ for pain
medication early in 2009.  C.S. brought medical records,
including x-rays, to his first office visit with DIAZ, which
DIAZ reviewed.  C.S. filled out a patient information form and
told DIAZ what type of pain medication he wanted.  C.S. ingested
the pain medication by either smoking or snorting it.  DIAZ
charged $90.00 per office visit, and DIAZ's waiting room was
always packed.  Sometime around May of 2009, C.S. noticed a sign
in DIAZ's office indicating that DIAZ was no longer accepting
new pain patients.  Thereafter, C.S. saw fewer young people in
DIAZ's waiting room.

16

14.  C.S. and J.L. (deceased individual identified in R.S.'s complaint to the Medical Board, discussed, infra) were friends.  After J.L. found a bottle of pills in C.S.'s bedroom with DIAZ's name on the label, J.L. started going to DIAZ.

15.  In November 2009, DI Harlig reviewed DIAZ's California prescription monitoring program ("CURES")[1] data and found that, during the six-month period of April 20 to October 14, 2009, C.S. filled 32 prescriptions for the following controlled substances:  14 prescriptions for oxycodone, 7 of which were for 80mg tablets (approximately 1890 dosage units total); 7 prescriptions for alprazolam (approximately 700 dosage units); 7 prescriptions for hydromorphone (approximately 1080 dosage units); and 4 prescriptions for methadone (approximately 330 dosage units).  DIAZ prescribed to C.S. a total of 4000 pills, or an average of 22 predominantly Schedule II opiates per day.

a.  About one month after the interviews, on January 5, 2010, DIAZ wrote C.S. a prescription for methadone 10mg (120 tablets) and oxycodone 80mg (180 tablets).  C.S. went to a Walgreens Pharmacy in Orange, California to fill the prescription.  Based on my training and experience, I know

---

[1]  California Department of Justice - Bureau of Narcotic Enforcement, Controlled Substance Utilization Review and Evaluation System (CURES).

that one of the indicators or "red flags" of drug diversion
and abuse is the use of multiple pharmacies and out-of-the-
area pharmacies to fill prescriptions.

DIAZ Patient L.C.

16.  On June 17, 2009, the Medical Board received a
complaint from E.B. concerning her daughter, L.C.  E.B. wrote of
her concern over the excessive drugs DIAZ had prescribed for her
daughter.  E.B. stated that the drugs were life threatening,
jeopardizing her daughter's safety and well-being, and impairing
L.C.'s ability to make sound decisions.

17.  DI Harlig reviewed DIAZ's CURES data and found that,
between April 2008 and June 2009, L.C. filled 83 prescriptions
for the following controlled substances:  27 prescriptions for
hydrocodone (approximately 6000 dosage units) and eight
prescriptions for oxycodone (approximately 1060 dosage units),
as well as prescriptions for Suboxone, amphetamine, methadone,
diazepam, and alprazolam.  DIAZ prescribed to L.C. in excess of
7000 pills, or an average of 16 predominantly Schedule II and
III pills per day.

DIAZ Patient M.C.

18.  On June 9, 2009, the Medical Board received a
complaint filed against DIAZ by S.C. on behalf of her daughter,

18

M.C., as well as a complaint signed by M.C. In S.C.'s complaint, S.C. stated that she, her husband, and M.C.'s psychiatrist wrote and telephoned DIAZ asking that he stop prescribing drugs to M.C. S.C. stated that M.C. was a drug addict thanks to DIAZ's "care" and that DIAZ was known in the community for giving drugs freely to young people. S.C. wrote that DIAZ had given M.C. Oxycontin and other drugs, and M.C. had seizures, could not function, drooled, could not walk, and had been to the emergency room numerous times.

19. The complaint filed by M.C. stated that DIAZ gave her huge quantities of prescription drugs, including oxycodone and Soma. M.C. wrote that she had completed a detoxification ("detox") program for addiction.

20. On December 14, 2009, SA Priymak and DI Harlig spoke with S.C. and M.C. S.C. told the investigators that M.C. had overdosed several times, each time after which M.C. went back to DIAZ.

21. M.C. stated that, about 8 years prior, she had been ill with endometriosis and was referred to DIAZ by Dr. D.B. When M.C. first saw DIAZ, she gave DIAZ her medical records, including ultrasounds. DIAZ conducted no new tests and prescribed Norco. DIAZ neither suggested nor proposed a

different treatment or diagnosis.

22. When M.C. complained to DIAZ that she was feeling ill, DIAZ told her it was because she was coming off the medication and he prescribed increasingly larger doses of controlled substances. In 2003 or 2004, DIAZ began prescribing 80mg oxycodone, ten tablets a day, and directed her to internet sites where she could purchase the drugs. M.C. stated that she became an addict years ago because of medication DIAZ prescribed for her. DIAZ never referred M.C. to a specialist for either her addiction or her illness.

23. The last time M.C. overdosed, around May 2009, she went to Cottage Hospital. The emergency room physician told M.C. that Cottage Hospital saw two to three overdoses each week due to DIAZ's prescribing. According to M.C., the detox unit at Cottage Hospital was also aware of DIAZ and his prescribing habits.

24. M.C. said that she knew three individuals who M.C. believed sold pills they obtained with DIAZ's prescriptions: S.Q., C.T., and M.T.

25. DI Harlig received DIAZ's CURES report and found the following with respect to M.C., S.Q., C.T., and M.T.:

        a. During the four-month period from April 7 to

August 1, 2009, M.C. filled approximately 13 prescriptions
for the following controlled substances:  8 prescriptions
for oxycodone (approximately 1080 dosage units); 2
prescriptions for hydrocodone (100 dosage units); 1
prescription for alprazolam (approximately 100 dosage
units); 1 prescription for fentanyl (approximately 5 dosage
units); and 1 prescription for morphine sulfate
(approximately 60 dosage units).  DIAZ prescribed to M.C.
in excess of 1300 pills, or an average of 11 predominantly
Schedule II pills per day.

     b.    For the same time frame, S.Q. filled no
prescriptions.

     c.    During the two-month period from July 6 to
September 9, 2009, C.T. filled 10 prescriptions for the
following controlled substances:  7 prescriptions for
hydrocodone (approximately 720 dosage units) and 3
prescriptions for clonazepam (approximately 270 dosage
units).  DIAZ prescribed to C.T. approximately 1000 pills,
or an average of 16 predominantly Schedule III pills per
day.

     d.    During the five-month period from April 6 to
September 23, 2009, M.T. filled 47 prescriptions for the

21

following controlled substances: 8 prescriptions for
oxycodone (approximately 1720 dosage units); 7
prescriptions for hydrocodone (approximately 1200 dosage
units); 5 prescriptions for fentanyl citrate (powder form);
6 prescriptions for alprazolam (approximately 360 dosage
units); and 7 prescriptions for methadone hydrochloride
(approximately 1920 dosage units). DIAZ prescribed to M.T.
in excess of 5000 pills, or an average of 35 predominantly
Schedule II opiates per day.

**2. Medical Board Investigator's Unannounced Visit to
DIAZ's Medical Clinic**

26. On September 9, 2010, Medical Board Investigator
Aracely Villalobos made an unannounced visit to DIAZ's medical
clinic on North Milpas Street in Santa Barbara, California.
Upon her arrival at approximately 9:30 a.m., she observed that,
although DIAZ's clinic was located in a very rundown area, one
of the individuals in the waiting area was a very well-dressed
young man in his early to mid-20s carrying a briefcase. This
individual was the first person Investigator Villalobos saw
called in to see DIAZ. About 15 minutes later, another patient
was called to see DIAZ; the well-dressed young man did not
return to the front of the office.

22

27.  In the early afternoon, Investigator Villalobos saw a young woman who appeared to be in her teens enter the clinic and ask the nurse at the desk what she needed to see the doctor. The nurse replied that the consultation was $120 and the starting rate for a month's supply of medication was $57.99, depending on what she needed.  The young woman went outside, then immediately returned and signed her name on the sign-in sheet.  The nurse informed her that the doctor did not see walk-in patients and gave her a business card to call for an appointment.

28.  Around 2:00 p.m., the receptionist came out and told the nurse it was time to lock the doors for lunch.  Investigator Villalobos identified herself and asked for copies of certain patient files.  While Investigator Villalobos was speaking with the office staff, a young man in his early 20s starting banging on the front door of the office.  He appeared anxious and, when the nurse approached the door and yelled, "come back after 3," the man responded, "I need to see the doctor; I need pills." The nurse replied, "after 3."

### 3.  Interview of DIAZ by Medical Board Investigator

29.  On October 6, 2010, Investigator Villalobos interviewed DIAZ.  DIAZ identified his specialties as General

23

Practice and Geriatrics. When asked about his treatment of patient M.C., DIAZ stated he saw her on a regular basis with complaints of severe pain. She developed a high tolerance level for opiates due to "over use of medication" and he referred her to a detox institute.[2]

30. Investigator Villalobos asked DIAZ to describe signs of an addicted patient. DIAZ identified the following indicators: a patient who sees various doctors, goes to multiple pharmacies, forges prescriptions, claims to have lost prescriptions, and has emergency room visits due to overdose. DIAZ differentiated a "pseudo-addicted" patient, who, according to DIAZ, becomes tolerant to the pain medication but still has real pain. A pseudo-addict informs his physician that the medication is no longer working and, therefore, requires a stronger dosage or medication. Such a patient will start to buy additional medication off the street. Therefore, when DIAZ becomes aware that a patient is a pseudo-addict, DIAZ makes the adjustment in the medication so the patient does not buy medication off the street.

31. Investigator Villalobos asked DIAZ whether patient

---

[2] In his review dated February 3, 2011, Medical Expert Shafi Khalid, M.D., found no departure from the standard of care in DIAZ's treatment of patient M.C.

24

M.C. was an addict because she had had multiple emergency room visits due to overdose, had been in and out of rehab, had admitted to buying prescription medications off the streets, and went to multiple pharmacies. DIAZ responded that M.C. had a pseudo-addiction. She was in pain and the medication being prescribed was not enough for her to function on a daily basis.

**B.  Interviews with Medical Personnel at Cottage Hospital**

**Physician Brett Wilson**

32. On January 7, 2010, SA Priymak and DI Harlig interviewed Dr. Brett Wilson, who told them the following. Dr. Wilson was one of 26 physicians employed at Cottage Hospital. Dr. Wilson worked in the emergency room ("ER"). Although Dr. Wilson had treated patients of DIAZ from all walks of life and of all ages, the majority of the patients were white males between the ages of 30 and 50. Approximately once a month, Dr. Wilson treated an overdose attributed to prescriptions written by DIAZ.

**Physician Chris Lambert**

33. On December 1, 2010, SAs Asia Webb and Mark Nomady and Task Force Officer ("TFO") Erin Grove interviewed Dr. Lambert, who told them the following. Dr. Lambert was the Chief of Emergency Medicine at Cottage Hospital and the head of a panel

25

of 26 physicians that reviewed cases of ER patients suspected of abusing pain medication. Based on a patient's medical and prescription history, Dr. Lambert would make a recommendation and the 26-physician panel would determine whether to ban the patient from receiving narcotics from the ER and/or to notify the patient's prescribing physician.

34. Three DIAZ patients were brought to Dr. Lambert's attention: J.J., E.S., and D.L. Dr. Lambert pulled a CURES report and noticed that DIAZ had prescribed high amounts of narcotics to all three patients. Cottage Hospital sent letters to DIAZ, and Cottage Hospital doctors, including Dr. Lambert, spoke to DIAZ about DIAZ's patients overdosing and DIAZ's prescribing habits. Although DIAZ appeared receptive and agreed to place the patient on pain management, nothing changed and Dr. Lambert's staff continued to see the same problems with DIAZ's patients. Dr. Lambert gave the following information regarding the three patients:

DIAZ Patient J.J.

a. J.J. overdosed while driving and crashed his car. J.J. had a diagnosis for pain; however, the CURES report revealed that in a five-month period from May 10 to October 13, 2010, DIAZ wrote J.J. 61 prescriptions for over 7,000

26

dosage units (approximately 45 pills per day).  According
to Dr. Lambert, J.J. displayed "drug seeking" and "drug
dependent behavior."

  DIAZ Patient E.S.

  b. According to a CURES report, on August 6, 2010,
DIAZ wrote E.S. five prescriptions for over 500 pills.  On
August 17, 2010, E.S. overdosed on narcotics and was
admitted to the Intensive Care Unit ("ICU").  The CURES
report revealed that after E.S. was released from the
hospital, E.S. went back to DIAZ on October 4, 2010, and
received additional narcotics with no reduction in dosage.

  c. SA Nomady asked Dr. Lambert whether DIAZ would
have known about E.S.'s overdose.  Dr. Lambert replied in
the affirmative, explaining that Cottage Hospital sent DIAZ
discharge summaries and copies of the admission reports.

  DIAZ Patient D.L.

  d. D.L. had been to the ER three times following
overdoses on September 25, November 10, and November 30,
2010.  On November 11, 2010, the day after D.L.'s second
overdose, Dr. Lambert's panel placed D.L. on the "no-
narcotics" list.  Therefore, the ER would have mailed D.L.
a letter stating, in substance: "You cannot receive

narcotics from the ER anymore because we are concerned about a pattern of narcotics over use. Here is a referral for pain management, and we also notified your doctor."

**Therapist Karen Claydon**

35. On January 27, 2011, SA Nomady and TFO Grove interviewed therapist Karen Claydon, who told them the following. Patients with psychiatric or chemical dependency issues were referred by the ER for inpatient psychiatric services. The psychiatric department assessed the need for the patient to receive in-patient treatment for chemical dependency. K.C. was familiar with DIAZ because one of the questions patients were asked upon intake was, "where did you get the drugs?" One story that stood out was a young woman who came into the ER in severe withdrawal. The woman told Ms. Claydon that DIAZ "cut her off" because his wife found out about the young woman and her girlfriend getting drugs from DIAZ in exchange for sex. Ms. Claydon counseled the young woman on the impropriety of her situation.

36. Ms. Claydon said it was typical for patients to go through a detox program and, the day they finished, to return to DIAZ and get drugs. She said the word was out on the street and people referred to DIAZ as the "Candy Man." People drove long

28

distances and came from out of town to go to DIAZ because they knew he was the man to go to for drugs.

**Registered Nurse Darcy Keep**

37. On January 27, 2011, SA Nomady and TFO Grove interviewed Darcy Keep, Nursing Director for Psychiatric Services, who told them the following. Patients with psychiatric or chemical dependency issues were referred by the ER to the inpatient psychiatric program. They assessed the need for the patient to receive in-patient treatment for chemical dependency. DIAZ was known in the community as the "Candy Man," and they often had patients with "just profound" numbers of opiates and sedatives that were prescribed to them by DIAZ. One such patient had received from DIAZ unsafe dosages of methadone, Lortab, Norco, Vicodin, Ativan, Klonopin, and Adderall in a single month. The psychiatric unit heard from numerous dependency and overdose patients that DIAZ was known in town as a doctor from whom you could get anything; "you just walk in his office, pay him whatever he wants, and he will give it [narcotics] to you." It was common for patients who completed detox and rehabilitation ("rehab") to go right back to DIAZ. Therefore, her department told DIAZ's patients that part of their treatment was not to go back to his office.

29

38. Ms. Keep knew of a set of twins in their early 20s that came to the program for detox. They both said they received drugs from DIAZ, for which they did not have to pay; rather, they would do things in exchange for the medication. The twins never said they had sex with DIAZ, but there were indications that it was an inappropriate relationship. One of the twins said that DIAZ's wife found out about her, after which DIAZ "cut her off." The patient panicked and came to Cottage Hospital for detox.

39. Ms. Keep told of another patient, S.M., who came to Cottage Hospital with massive doses of medication from DIAZ. S.M. went through detox and then went to a three-month recovery program in Southern California. He returned to Santa Barbara in September 2009. Three days later, S.M. died from an opiate overdose from narcotics he received from DIAZ.

40. Cottage Hospital's Medical Director, Dr. Paul Erickson, told Ms. Keep that he spoke several times with DIAZ about DIAZ's prescribing outside the standards of medical care. According to Dr. Erickson, although DIAZ seemed like a reasonable man, when Dr. Erickson admonished DIAZ about the quantities he was prescribing, DIAZ appeared indifferent, merely stating that he disagreed with Dr. Erickson's assessment.

30

**Physician Terrence Early**

41.   On January 27, 2011, SA Nomady and TFO Grove
interviewed Dr. Terrence Early, who told them the following.
Patients of DIAZ came to the ER, and Dr. Early was struck by the
high doses of opiates and multiple addicting medications that
DIAZ was giving them.  The ER doctors were so concerned that
they wrote several letters to the California Medical Board
documenting specific cases.  Dr. Early heard that DIAZ provided
narcotics to patients who in turn sold them on the street.  Dr.
Early also suspected patients were selling the drugs because the
amounts prescribed by DIAZ, if actually taken, would be fatal.
DIAZ also prescribed multiple opiates in the same category that
were contraindicated.

42.   Dr. Early treated one of DIAZ's patients who had
migraine headaches; the patient had received progressively
higher doses of opiates from DIAZ.  The patient came to Cottage
Hospital where he was treated for chemical dependency.  Dr.
Early weaned the patient off the opiates and followed up with
the patient for 2 years.  However, after the patient had trouble
sleeping, he went back to DIAZ.  DIAZ prescribed the patient
gamma-hydroxybutyrate (GHB), which is generally only prescribed
following intensive testing for narcolepsy, and the patient

31

began to abuse.

43. On occasion, Dr. Early spoke with DIAZ about the dosages DIAZ was prescribing. However, Dr. Early believed that DIAZ's prescribing was so egregious and had gone on for so long with so many patients, speaking with DIAZ did no good. In response to question from SA Nomady, Dr. Early opined that, while difficult to estimate, more than half of DIAZ's patients that Dr. Early had seen had been prescribed narcotics outside the scope of legitimate professional practice, and the over-prescribing was "without a doubt," not merely negligent.

**Physicians Chris Lambert and Mark Richmond**

44. On January 27, 2011, SA Nomady and TFO Grove interviewed Dr. Chris Lambert, Chief of Emergency Medicine, and Dr. Mark Richmond, Medical Director of the Emergency Department, who told them the following. After giving SA Nomady and TFO Grove a spreadsheet and supporting documentation he had prepared, Dr. Lambert explained that he researched all ER patients from January 2009 to December 2010 who identified DIAZ as their treating physician. The spreadsheet demonstrated DIAZ's pattern of over-prescribing and the direct relationship between the prescriptions received and ER visits and admissions.

During that two-year time frame, Dr. Lambert documented the
following with respect to DIAZ patients:

- 410 ER visits;

- 112 hospital admissions;

- 30 patients admitted into the Intensive Care Unit;

- 44 patients with a "high risk diagnosis," most of which
  were related to addiction and overdose;

- 39 of the 44 "high risk" patients were prescribed
  significant amounts of narcotics or sedatives during 2010,
  even after one or more ER admissions; and

- Two patients, 96 and 100 years old, respectively, were
  prescribed significant amounts of narcotics, which was
  outside a prudent standard of care.

45.   Dr. Lambert said that DIAZ was notified of his
patients' ER visits and diagnoses by electronically-generated
facsimiles.  Further, it had become ER policy to also attempt
telephonic notification with DIAZ personally, which Dr. Lambert
said was done at least several times.

46.   Dr. Mark Richmond said that as Director, "everyone"
brought DIAZ cases to him.  Dr. Richmond also personally saw
cases where DIAZ prescribed narcotics "so far outside the
guidelines."  In one instance, DIAZ once gave a patient 10 mg.
vials of injectable Dilaudid (hydromorphone), "which [was]
enough to kill a horse, essentially."

33

47.   Dr. Lambert told of a situation approximately a year before when one of the hospital's social workers, therapist Karen Claydon, told them about two young women who were DIAZ's patients.   The women came to the ER with a drug-related diagnosis and were referred to Ms. Claydon for counseling.   Both women both said that they were getting narcotics from DIAZ in exchange for sexual favors.   They alluded to numerous friends also receiving narcotics from DIAZ in exchange for sexual favors.

48.   Dr. Richmond said that another physician, Dr. Steve Mills, had treated a lot of young overdose patients of DIAZ. Two such patients, who were 18 or 19 years old, possibly brothers, drove to Santa Barbara from Simi Valley.   They received a large amount of narcotics from DIAZ ("enough to instantly kill them") and then overdosed.   Dr. Richmond believed they were still alive.

49.   According to Dr. Lambert, Drs. Andrew Gersoff and Mark Bookspan also compiled a list of patients within the last 10 years that they believed were overprescribed by DIAZ.   However, they sent the information to the Medical Board and did not retain a copy.   Dr. Richmond told SA Nomady that he could point to any of the doctors with whom he worked and the doctor would

34

tell SA Nomady that DIAZ was "a notorious problem"; there was "no mystery there."

### Reverend Teena Grant

50.  On January 28, 2011, SA Nomady and TFO Grove interviewed Reverend Teena Grant, who told them the following. Rev. Grant worked in Cottage Hospital's critical care unit.  A young man in his 20s attempted suicide by hanging, and Rev. Grant spoke with his mother.  The mother told Rev. Grant that DIAZ was well-known in the community for providing drugs to anyone who asked, and DIAZ was responsible for keeping her son addicted to drugs.  Rev. Grant provided the mother with information on how to file a complaint against DIAZ.  The young man was seriously and permanently injured; he was still in the sub-acute unit at the Goleta hospital.

### Physician Paul Erickson

51.  On February 1, 2011, Dr. Paul Erickson called me and told me the following.  Dr. Erickson was the Medical Director of psychiatry and chemical dependency, and had been employed at Cottage Hospital since 2002.  Dr. Erickson had written six to seven letters to the DEA and the Medical Board regarding DIAZ's over and inappropriate prescribing of Schedule II and III narcotics.  In early 2003, Dr. Erickson treated a patient whose

35

primary care physician was DIAZ.  The patient told Dr. Erickson
that DIAZ prescribed large amounts of Oxycontin, and also
dispensed from his office, and the patient then sold the
narcotics on the streets.  The patient was trying to change
doctors and no longer see DIAZ.

**Physician Panel**

52.  On February 3, 2011, SA Marshall and DI Spencer
Shelton conducted an interview with a panel of doctors, the
panel consisting of Dr. Mark Bookspan (Director of Control
Medicine and Education), Dr. Thaddeus Bordofsky (Associate
Program Director of Internal Medicine Residency), Dr. Steve
Hosea (Director of Clinical Care), and Dr. Andrew Gersoff
(Program Director of Internal Medicine Residency).  SA Marshall
advised the panel that the DEA was looking into overprescribing
and out-of-the-ordinary prescribing of scheduled medicines by
DIAZ, and the panel reported the following.

53.  Drs. Bookspan and Bordofsky said the overwhelming
issue is poly-pharmacy.  DIAZ consistently had his patients on
large doses of opiates, plus Ritalin and a couple of anti-
depressants.  It was a consistent cornucopia of medications with
DIAZ patients.

54.  On several occasions, Dr. Bookspan talked to DIAZ in

36

person and told him that a patient was at risk because of what he/she was using and how he/she was using it.  Dr. Bookspan asked DIAZ to change his treatment, but then the patient came in with another overdose.  DIAZ's practice did not change, which went beyond poly-pharmacy.

55.  Dr. Hosea said he pretty much knew when a DIAZ patient was admitted when he looked at the patient's medication list and there were three to six narcotic opiates at extraordinary doses.  It was not just the number of drugs prescribed, but the dosages of the drugs were much higher than Dr. Hosea would be comfortable prescribing.

56.  The one thing that stuck out clearly in Dr. Hosea's mind was the "cosmic doses" of opiates DIAZ prescribed for his patients.  DIAZ's prescribing was egregious and irresponsible, which was the motivation for Dr. Hosea's attendance at the panel interview.  Dr. Bookspan added that the Residents used, "this is a DIAZ patient," as shorthand for a patient on an unbelievable number of sedatives and narcotic medications.

C.  **Pharmacist Interviews**

**Walgreens Pharmacist Michelle Whalley**

57.  On August 11, 2010, Walgreens Pharmacist Michelle Whalley in Auburn, California, called the DEA duty line and

37

reported the following.  DIAZ was prescribing large amounts of
controlled substances, specifically buprenorphine, Norco, and
Xanax, to a certain patient.  Ms. Whalley spoke to DIAZ on
several occasions and he denied issuing the prescriptions.

   a. Based on my training and experience, I know that
among the indicators and "red flags" of drug diversion and
abuse are patients who travel long distances to see a
particular physician for prescriptions and the use of out-
of-the-area pharmacies to fill prescriptions.  In addition
to the Walgreens Pharmacy in Auburn, California, DIAZ's
patients filled prescriptions at pharmacies in the
following California cities outside the Santa Barbara area:
Agoura Hills, Alhambra, Bakersfield, Big Bear Lake, Bishop,
Burbank, Carson, Cathedral City, Concord, Downey, Fresno,
Fullerton, Huntington Beach, Irvine, La Jolla, Lake
Elsinore, Lakewood, Lancaster, Lincoln, Los Angeles,
Malibu, Marina Del Rey, Modesto, Montrose, North Hollywood,
Novato, Oceanside, Orange, Palm Desert, Placerville,
Redwood City, Riverside, Rocklin, Sacramento, San Anselmo,
San Bernardino, San Clemente, San Diego, Santa Clarita,
Santa Cruz, Santa Monica, Sherman Oaks, Simi Valley,
Sonora, Temple City, Thousand Oaks, and Van Nuys.

58.   On September 8, 2010, SA Webb called Ms. Whalley and
spoke with her about her complaint.  On August 1, 2010, Ms.
Whalley spoke with DIAZ about his prescribing.  DIAZ told Ms.
Whalley that he was prescribing the patient Subutex for pain
control and was discontinuing all Norco.  Ms. Whalley asked DIAZ
for his registry number (i.e., special registration required in
the Controlled Substances Act for the provision of medication-
assisted opioid therapy), and DIAZ told her that Ms. Whalley did
not need it because DIAZ was using Subutex for pain not
substance abuse.

59.   Three weeks later, the patient walked into the
pharmacy around 8:50 p.m. right before closing and requested
refills on Norco and buprenorphine.  Ms. Whalley told the
patient that he did not have any more refills.  However, anytime
the patient had any problems with his prescriptions, he
instantly got DIAZ on the phone.  On this occasion, contrary to
his representation to Ms. Whalley weeks earlier that DIAZ was
getting the patient off Norco, DIAZ again called in
buprenorphine and Norco.

60.   When questioned by Ms. Whalley, DIAZ said the patient
could not go from 150-180 tablets of Norco down to nothing and
the patient was going through withdrawal, which was why the

39

patient was receiving buprenorphine. Ms. Whalley responded that DIAZ told her the buprenorphine was for pain control and not withdrawal. DIAZ began to hesitate and then contradicted himself, saying, "well, the patient was using it for pain." Ms. Whalley told DIAZ he was contradicting himself, she did not believe the medication was being properly prescribed, and, consequently, Ms. Whalley did not feel comfortable filling the prescription. Ms. Whalley further told DIAZ she was confused as to why a patient that lived in Auburn was seeing DIAZ all the way in Santa Barbara, which was about 10 hours away, and Ms. Whalley asked DIAZ how he was assessing the patient's pain. DIAZ replied that the patient was a firefighter who traveled a lot, and he did not want to change doctors all the time, so he called in for his refills.

61. Ms. Whalley refused to fill the prescription, after which the patient went across the street to Bel Air Pharmacy. Moments later, the Bel Air Pharmacy manager called Ms. Whalley and asked her what was going on with the doctor and the patient who was getting medication all over the place.

a. According to Ms. Whalley, some of the patient's refills were filled at Walgreens in Sandy, Utah; Jordan, Utah; Hickory, NC; Roseville, CA; and Goleta, CA. Ms.

40

Whalley said the early refills were not flagged because the patient did not have regular insurance or a prescription program that cross-referenced refills among different pharmacies.

62.  Ms. Whalley gave SA Webb the patient and prescription profile, which identified the patient as R.W., 27 years old, of Auburn, California.  SA Webb compared the prescription profile and the CURES report, which revealed that R.W. received hydrocodone, buprenorphine, and alprazolam from multiple locations on the same day or within days of each other.

**Walgreens Pharmacist Liza Saguto**

63.  In June 2009, the DEA received a complaint from a Walgreens pharmacy in Goleta, California, which stated that DIAZ was prescribing Schedule II and III controlled substances to young college-age adults.

64.  On June 14, 2010, SA Priymak called the pharmacy and spoke with Pharmacist Liza Saguto, who told her the following. Although Ms. Saguto was not the original complainant, she knew about DIAZ prescribing controlled substances for young college-age adults.

41

**CVS Pharmacists Amit Sule and Christine Malengo**

65. On January 26, 2011, SA Webb and DI Eva Lew interviewed Pharmacists Amit Sule and Christine Malengo at CVS Pharmacy in Santa Barbara, who told them the following. For approximately six years, ending in September 2010, Mr. Sule worked at Walgreens Pharmacy in Oxnard. In late 2008, Mr. Sule frequently saw young customers around 20 years' old and with no apparent medical need bring prescriptions for large amounts of Oxycontin 80 mg. and Soma. The customers, who escalated in 2009 and early 2010, had no insurance and paid in cash. Even though the pharmacists verified the prescriptions with DIAZ, Walgreens was concerned and stopped filling the prescriptions.

66. In the summer of 2008, Pharmacy Manager Malengo stopped filling DIAZ's prescriptions for high quantities of narcotics, although she filled DIAZ's prescriptions written for maintenance medications such as Lipitor. The customers appeared of low economic status and older than the 20-year olds, with lots of cash for certain medications. Ms. Malengo called Diaz, who told her, "if you can't take the bad ones [prescriptions], I won't send the good ones either." Ms. Malengo knew that other local pharmacists shared the same concerns with DIAZ's

42

prescriptions; Sansum Pharmacy, for example, did not accept
DIAZ's prescriptions.

D.  **Overdose Deaths Associated with DIAZ**

   **DIAZ Patient J.T.**

   67.  J.T., age 26, died on January 18, 2006, in Goleta,
California.  According to the report of the Santa Barbara County
Coroner ("SBCC"), the immediate cause of death was acute
multiple drug ingestion.  The toxicology test results indicated
J.T. was positive for oxycodone 470ng.  The SBCC report noted
that "[u]sual therapeutic levels for this drug range from 9 to
38ng."  DIAZ was identified as J.T.'s private physician.  J.T.'s
death was classified as a suicide.

   68.  On January 27, 2011, SAs Webb and Dennis John
interviewed J.T.'s sister, also with the initials J.T., about
the death of her brother, and she told them the following.  J.T.
attended Santa Barbara Community College for two years, during
which he used small amounts of marijuana and pills.  Then, J.T.
moved to San Diego and started attending University of
California, San Diego, and his drug usage spiraled out of
control.  Unable to keep up academically, he eventually returned
to Santa Barbara.

69.  J.T. began seeing DIAZ in 2004/2005.  J.T. told his sister that he could get whatever he wanted from DIAZ.  Although J.T. was addicted to drugs before he started seeing DIAZ, DIAZ was an easy access for J.T. to get pills.

**DIAZ Patient T.S.**

70.  T.S., age 46, died on May 19, 2006, in Lompoc, California.  According to the SBCC's report, the immediate cause of death was multiple drug ingestion.  The toxicology report indicated T.S. was positive for a lethal level of fentanyl, as well as venlafaxine, nordiazepam, and bupropion.

71.  DIAZ was identified as T.S.'s private physician.  On May 23, 2006, Detective P.R. Trudgeon, Deputy Coroner, spoke with DIAZ who stated the following.  T.S. was diagnosed with coronary artery disease, hyperlipidemia, depression, epilepsy, non-active hepatitis, and schizophrenia.  T.S. did not abuse his medications.  DIAZ concurred with Detective Trudgeon that T.S. had many risk factors for a sudden cardiac event.

**DIAZ Patient S.G.**

72.  S.G., age 52, died on July 8, 2007, in Carpentaria, California.  According to the SBCC's report, the immediate cause of death was multiple drug ingestion.  The toxicology test

44

results indicated S.G. was positive for Effexor, nordiazepam,

Valium, methadone, hydrocodone, and marijuana.

73.  DIAZ was identified as S.G.'s private physician.  In

the Medical History section of the SBCC report, Detective Marty

Rose, Deputy Coroner wrote:

> This decedent was found to be taking a number of prescribed
> medication[s] in order to control the pain from his various
> ailments, to include Methadone, Vicodin, Propoxy
> (Darvocet), Lyrica, and Valium.  He was also taking
> Neurontin (Gabapentin) for a[n] epilepsy disorder, Flomax
> for an enlarged prostate, Effexor for depression and
> anxiety, Provigil for sleep apnea, Methimazole for
> hypothyroidism, and a stimulant for narcolepsy.  Due to the
> large number of pills this decedent was taking, it is
> apparent that an overdose could very easily take place.

**DIAZ Patient M.L.**

74.  M.L., age 53, died on October 26, 2007, in Santa

Barbara, California.  According to the SBCC's report, the

immediate cause of death was multiple drug ingestion.  The

toxicology test results indicated M.L. was positive for

diazepam, nordiazepam, alprazolam, methadone, and oxycodone (320

ng/mL).  The SBCC report noted that the toxic level for

oxycodone was 200 ng/mL.

75.  DIAZ was identified as M.L.'s personnel physician.

SBPD Officer Montag spoke with DIAZ around midnight on October

27, 2007, and was told the following.

a.   M.L. had been DIAZ's patient for approximately two years.  DIAZ was treating her for arthritis and hypertension; DIAZ also had her on a methadone maintenance program.  DIAZ last saw M.L. in September 2007 for a routine office visit.

76.   On November 6, 2007, SBCC Detective Rose spoke with the decedent's daughter, K.B.  K.B. said she felt her mother had been overmedicated.  K.B. was concerned that DIAZ had not paid attention to the prescriptions he gave M.L.

77.   On February 3, 2011, I conducted a telephonic interview of K.B., who told me the following about the death of her mother, M.L.  Although the original reason M.L. gave for seeing DIAZ was for pain, K.B. did not think her mother had any.  K.B.'s mother went to DIAZ because she could get whatever she wanted.

78.   K.B. said that, about five years earlier, she also saw DIAZ.  After K.B.'s husband left her, K.B. wanted Xanax and Vicodin.  During the initial visit with DIAZ, K.B. told DIAZ that her back hurt and she was going through a divorce and had anxiety.  DIAZ had K.B. touch her toes and bend side-to-side.  K.B. did not remember anything else about the initial examination; K.B. was in DIAZ's office for 10 minutes.  DIAZ

46

asked K.B. to obtain an x-ray, but she never did.  K.B.
overdosed on Xanax; K.B.'s children called for medical attention
when they were unable to wake her.  K.B. believed DIAZ
prescribed too much.

**DIAZ Patient L.L.**

79.  L.L., age 56, died on January 18, 2008, in Santa
Barbara, California.  According to the SBCC's report, the
immediate cause of death was multiple drug ingestion.  The
toxicology test results indicated L.L. had a blood alcohol
content of .092%, as well as oxycodone 240 ng/mL.

80.  DIAZ was identified as L.L.'s primary care physician.
SBCC Detective Rose spoke with DIAZ, who said the following
regarding his patient, L.L.  L.L. had a long history of back
problems and had to take a significant amount of pain medication
to deal with the issue.  L.L. had been diagnosed with Hepatitis
C and had also been known to DIAZ to be a substance abuser of
some note.

**DIAZ Patient O.S.**

81.  O.S., age 35, died on March 16, 2008, in Santa
Barbara, California.  According to the SBCC's report, the
immediate cause of death was multiple drug ingestion.  The
toxicology test results indicated M.L. was positive for Prozac,

47

Nordiazepam, and Dilaudid. The SBCC report noted that the concentration level of Dilaudid was more than ten times a therapeutic dose.

82. DIAZ was identified as O.S.'s primary care physician. SBCC Detective Rose spoke with DIAZ on March 17, 2008, and was told the following.

a. DIAZ had been seeing O.S. for a number of years and he knew her very well. O.S. suffered from diabetes, hypertension, and a number of other ailments, and she was also a drug addict. For a number of years DIAZ was unable to prescribe opiate drugs for O.S. because she abused them. However, O.S. obtained prescription medications from her family and on the street. DIAZ opined it more likely that O.S. died due to an overdose than any physical ailment.

**DIAZ Patient T.T.**

83. T.T., age 33, died on December 27, 2008 in Carpinteria, California. According to the SBCC's report, the immediate cause of death was multiple drug ingestion. The toxicology test results indicated multiple prescription medications and narcotics in T.T.'s system at the time of her death. In the bathroom trash can of T.T.'s motel room, detectives found an empty bottle of alprazolam 1mg, 100 count,

48

which had been prescribed by DIAZ and was issued on December 26, 2008.

84.  DIAZ was identified as T.T.'s primary care physician. On December 29, 2008, Detective J. Alvarez, Deputy Coroner, spoke with DIAZ, who told him the following.

a.  DIAZ began seeing T.T. in August 2008.  T.T. had chronic panic attacks and was complaining of cervical back pain.  DIAZ had recently prescribed hydrocodone and Xanax (alprazolam).  When told of the empty bottle of alprazolam, DIAZ stated he was convinced that T.T.'s boyfriend either force fed the medication to T.T. or he did something with the medication because there was no way T.T. would have committed suicide.

i.  On December 29, 2008, Detective Alvarez spoke with T.T.'s parents who informed him that T.T. was bipolar, had been treated by numerous psychiatrists in the past several years, had a history of drug use, and had two prior suicide attempts by drug ingestion.

b.  DIAZ said that T.T. had seen Dr. Brown, a cardiologist.  DIAZ stated that if the toxicology results

49

were to come back negative, DIAZ would be willing to sign the death certificate due to some sort of heart failure.

     i.    On January 5, 2009, Detective Alvarez spoke with a receptionist from Dr. Brown's clinic. She informed Detective Alvarez that the clinic had no record of T.T. ever having been seen by Dr. Brown or any of the cardiologists.

**DIAZ Patient A.M.**

85. A.M., age 37, died on March 21, 2009, in Santa Barbara, California. According to the SBCC's report, the cause of death was atherosclerotic cardiovascular disease, with other significant conditions of obesity, diabetes, hypertension, seizure disorder, and drug abuse. The toxicology report indicated various levels of drugs.

86. DIAZ was identified as A.M.'s primary care physician. Detective Alvarez spoke with DIAZ on March 23, 2009, and informed DIAZ that he believed A.M. suffered a sudden cardiac event. However, Detective Alvarez was concerned about A.M.'s age and wanted to confirm her medical conditions. DIAZ agreed with Detective Alvarez's findings and also felt A.M. suffered some form of a cardiac event due to her obesity, hypertension, hypercholesterolemia, and diabetes.

**DIAZ Patient J.L.**

87.   J.L., age 25, died on April 7, 2009 in Santa Barbara, California.  (J.L. was the friend of C.S. mentioned in the 9/21/09 complaint by R.S. to the Medical Board, discussed supra.)  According to the SBCC report, the immediate cause of death was acute complications of narcotics abuse.  The toxicology report indicated J.L. tested positive for, inter alia, oxycodone, morphine, benzodiazepines, and marijuana.

88.   DIAZ was identified as J.L.'s private physician.  In J.L.'s bedroom, SBCC Deputy D. Nelson found a prescription for oxycodone and Xanax prescribed by DIAZ the day before, on April 6, 2009.  Detective Matt Fenske, Deputy Coroner, spoke with DIAZ who told him the following.

   a.   DIAZ saw J.L. for the first time on April 6, 2009.  J.L. requested a prescription for OxyContin.  J.L. told DIAZ that he received OxyContin from a doctor in Los Angeles, but DIAZ did not know the physician's name.  J.L. told DIAZ about a previously fractured ankle and said he managed the pain with Oxycontin and Xanax.

   b.   Detective Fenske reviewed DIAZ's medical records for J.L., which indicated a history of obesity, high blood

.

51

pressure, and chronic lower back pain. DIAZ prescribed medications including OxyContin and Xanax.

89. On April 10, 2009, Detective Fenske spoke with a pharmacy technician at CVS Pharmacy and requested J.L.'s records. The records indicated that, on April 6, 2009, J.L. attempted to fill J.L.'s prescription from DIAZ. However, the pharmacy only filled the Xanax prescription. The CVS pharmacy technician opined that they generally did not like to fill prescriptions from DIAZ because the amounts of medications prescribed were too extreme.

**DIAZ Patient D.P.**

90. D.P. died on August 5, 2009, in Santa Barbara, California. Inside D.P.'s shorts' pocket, SBCC Deputy J. Cockrell found five Dilaudid (hydromorphone) pills. The SBCC report listed the immediate cause of death as multiple drug ingestion. Deputy Cockrell spoke with D.P.'s wife, M.P., who reported the following.

a. D.P. suffered from tuberculosis, consumed large amounts of alcohol, and was a habitual drug user. D.P.'s drug of choice was heroin. However, in the past months, D.P.'s heroin use declined; instead, he was taking increased dosages of prescribed medication. D.P. saw DIAZ

for back pain, and DIAZ gave D.P. several different
prescription medications.

91.  On January 26, 2011, at 2:15 p.m., SA Webb and I
interviewed M.P., who told us the following.  D.P. had been a
drug addict since he was a teenager.  D.P. was a mason and
complained about legitimate back pain.  During those times, D.P.
went to a chiropractor for therapy.

92.  When D.P. started going to DIAZ for pain treatment,
D.P. tried to see DIAZ as much as possible to get pills.  M.P.
and D.P. argued over all the pills he got from DIAZ.  M.P. saw
the following pills:  oxycodone, Norco, and, sometimes,
Dilaudid.  Eventually, D.P. hid the pills he got from DIAZ.

93.  M.P. was an Occupational Therapist and often treated
DIAZ's patients at her job.  Although M.P. believed most of her
patients were legitimate patients of DIAZ, DIAZ was at times
strange and rude when she called him about one of his patients.
This was one of the reasons M.P. did not confront DIAZ about the
medication her husband was receiving.

94.  M.P. did not believe DIAZ got D.P. addicted pills;
rather, DIAZ "fueled his drug habit."  A week before D.P. died,
he switched from DIAZ to Dr. J.K. in order to get help with his

pain medication addiction.  M.P. believed that Dr. J.K. was giving D.P. proper treatment for his addiction.

**DIAZ Patient M.D.**

95.  M.D., age 44, died on August 15, 2009, in Santa Barbara, California.  The SBCC report identified DIAZ as M.D.'s private physician and listed the following controlled substances under the heading, "Treatment & Medications":  Suboxone, hydromorphone, alprazolam, ibuprofen, clonazepam, Pamprin, diphenhydramine, diazepam, benzodiazepine, and Dilaudid.  Deputy Cockrell spoke with DIAZ, who stated that on M.D.'s last visit on August 13, 2009, M.D. tested positive for cocaine and that DIAZ would sign a death certificate if it were determined that M.D. died from a cocaine overdose.

**DIAZ Patient A.M.**

96.  A.M., age 27, died on November 25, 2011, in Lompoc, California.  Although the SBCC investigation has not been completed, the draft report states:  "At this time, it appears the decedent overdosed from injecting his prescription medication."  The following medications were found in A.M.'s bedroom and car:

- Empty bottle of oxycodone 30mg (90 tablets), prescribed by DIAZ on November 15, 2011.

54

- Empty bottle of hydromorphone 8mg (90 tablets), prescribed by DIAZ on November 15, 2011.

- Bottle of methadone 10mg (180 tablets), prescribed by DIAZ on November 14, 2011, 30 tablets remaining.

- Bottle of alprazolam 2mg (120 tablets), prescribed by DIAZ on November 14, 2011, 16 tablets remaining.

- Bottle of methadone 10mg (160 tablets), prescribed by DIAZ on November 14, 2011, 2 tablets remaining.

- Empty bottle of oxycodone 30mg (150 tablets), prescribed by DIAZ on October 17, 2011.

- Empty bottle of hydromorphone 8mg (150 tablets), prescribed by DIAZ on October 17, 2011.

97.   The draft report indicates that SBCC Deputy Matthew J. Delgado "observed several 'track marks' on the inside of the decedent's left forearm (near the bend)."  Based on his training and experience, Deputy Delgado opined that "the marks were similar to those found on intravenous (IV) drug users." Further, in A.M.'s car, Deputy Delgado found a slip from Santa Barbara Police Department case 2011-80203, which stated prescription medications for Xanax, Dilaudid, and oxydodone were stolen from A.M.  Based on his training and experience, Deputy Delgado notes that some individuals file police reports for stolen prescription medications in order to obtain more medication.

55

98.   On December 2, 2011, I obtained DIAZ's CURES report for A.M., which disclosed the following.  From October 14 to November 15, 2011, A.M. received methadone 10mg (340 tablets), oxycodone 30mg (577 tablets), hydromorphone 8mg (630 tablets), alprazolam (300 tablets), and acetaminophen/oxycodone 325/10mg (240 tablets).  In the six weeks before A.M.'s death, DIAZ prescribed to A.M. a total of 2,087 pills, or an average of 63 predominantly Schedule II and III pills per day.

## E.   Investigation of DIAZ by Anthem Blue Cross Insurance

99.   For the period from June 1, 2007 to May 31, 2010, Anthem Blue Cross Insurance ("Anthem") analyzed the claims data for prescriptions written under DIAZ's DEA number.  Set forth below are the pertinent results.

### Table 1 - Top 10 Prescription Drugs

| Therapy Class | Total Billed | Total Paid |
|---|---|---|
| Narcotic Analgesics | $ 687,023.61 | $ 220,254.38 |
| Tranquilizers | $  56,456.92 | $  21,165.71 |
| Non-Narcotic Analgesics | $  45,381.98 | $  10,995.11 |
| Anti-Ulcer/Gastrointestinal | $  38,729.48 | $  10,625.33 |
| Miscellaneous | $  27,381.71 | $   9,415.23 |
| Psychostimulants-Antidepressants | $  26,599.03 | $   7,645.03 |
| Amphetamine Preparations | $  24,610.56 | $   4,025.79 |
| Muscle Relaxants | $  23,592.45 | $   3,714.39 |
| Antinauseants | $  19,428.32 | $   3,085.56 |
| Diabetic Therapy | $  19,409.77 | $   2,599.41 |
| Total | $ 968,613.83 | $ 293,525.94 |

### Table 2 - Top 10 Narcotic Analgesics (57% of all billed prescriptions)

| Medication | Total Billed | Total Paid |
|---|---|---|
| Oxycodone Hcl 80mg | $ 249,294.58 | $ 123,081.16 |
| Oxycodone Hcl 40mg | $ 111,020.30 | $ 16,385.68 |
| Hydrocodone-Acetaminophen 10mg-325mg | $ 92,384.97 | $ 19,333.13 |
| Oxycodone Hcl 30mg | $ 39,701.38 | $ 14,906.13 |
| Oxycontin 60mg | $ 37,346.49 | $ 12,810.23 |
| Fentanyl Citrate 1600mcg | $ 37,050.90 | $ 0.00 |
| Hydromorphone Hcl 8mg | $ 32,030.62 | $ 14,288.05 |
| Fentanyl 100mcg | $ 15,793.69 | $ 3,076.84 |
| Hydrocodone-Acetaminophen 7.5-750mg | $ 8,627.24 | $ 743.86 |
| Oxycodone Hcl 15mg | $ 7,814.85 | $ 2,704.43 |
| Total | $ 631,065.02 | $ 207,329.51 |

### Table 3 - Top 10 Members with Highest Billed Prescriptions

| Member Age* | Member Name | Total Billed | Total Paid |
|---|---|---|---|
| 23 | M.C. | $ 235,431.34 | $ 63,746.48 |
| 20 | N.H. | $ 55,581.26 | $ 6,936.17 |
| 19 | C.S. | $ 53,156.36 | $ 34,565.05 |
| 21 | A.C. | $ 53,055.64 | $ 32,460.74 |
| 35 | V.A. | $ 46,507.55 | $ 2,178.04 |
| 54 | F.V. | $ 42,229.15 | $ 15,844.41 |
| 52 | R.W. | $ 35,255.31 | $ 12,415.60 |
| 31 | D.G. | $ 27,714.92 | $ 9,725.82 |
| 41 | G.T. | $ 27,135.50 | $ 6,755.33 |
| 49 | S.S. | $ 24,432.85 | $ 10,525.85 |
| Total | | $ 600,499.88 | $ 195,153.49 |

\* In cases where the member received prescriptions over several years, the youngest noted age was used.

### Table 4 - Examples of Patients Residing More than 100 Miles from DIAZ's Medical Office

| Member Name | Member Residence | Distance from DIAZ's office |
|---|---|---|
| G.M. | Port Arthur, TX | 1735.75 miles |
| L.M. | Shingle Springs, CA | 433.68 miles |
| J.H. | Temecula, CA | 183.88 miles |
| C.G. | Los Osos, CA | 116.50 miles |

| M.A. | Pico Rivera, CA | 110.65 miles |
|------|-----------------|--------------|

## F.  Interview of Former Employee Angelica Magana

100. On December 6, 2011, SAs Maria Zavala, Lisa Leduc, and I interviewed Angelica Magana, who told us the following.

a.   Ms. Magana is a licensed vocational nurse ("LVN").  She received her license from Santa Barbara Business College on March 11, 2011.

b.   Ms. Magana began working for DIAZ on October 5, 2011, after responding to an advertisement on Craigslist for a LVN position at DIAZ's medical clinic on North Milpas Street in Santa Barbara.  Ms. Magana identified DIAZ's DMV photo as the person for whom she worked.

c.   DIAZ's patients were an equal mix of Hispanics and Caucasians; the Caucasians were primarily DIAZ's pain management patients.  Approximately 75% of DIAZ's patients paid cash.  DIAZ charged $180 for a pain management visit and $120 for a regular visit.

d.   DIAZ gave all of his pain management patients both prescriptions and pills from the clinic.  Ms. Magana recalled that DIAZ did not have Oxycontin or methadone on hand, but he wrote prescriptions for oxycodone, Soma, and

methadone. DIAZ recorded his prescribed medications on a computer.

e. Ms. Magana saw DIAZ prescribe medication to patients who tested positive for cocaine and methamphetamine. For example, three times patient B.D. tested positive for cocaine, yet DIAZ still gave him prescriptions.

f. "Pain patients" were supposed to have a urinalysis every two months. However, pain patient M.T. had not had a urinalysis for six months. When Ms. Magana asked office staff why it had been so long, they informed her that the last time M.T. tested positive for methamphetamine, so DIAZ said he did not want M.T. to do any more urinalysis. Ms. Magana also recalled a patient who provided a urinalysis that contained water receiving prescriptions from DIAZ. Ms. Magana saw DIAZ rip up and throw away a lot of patient documents, in particular urinalysis.

g. On four occasions, Ms. Magana saw DIAZ write prescriptions for patients who were not present, usually family members.

59

h.    DIAZ's wife, Socorro (also known as "Coco") worked at the clinic.  Socorro had no medical education and was responsible for scheduling appointments.  Almost daily, Ms. Magana observed the following scenario:  Socorro would tell DIAZ that a patient needed a prescription, DIAZ would write out the indicated prescription, and Socorro would take the prescription to the patient waiting in the lobby. Ms. Magana also heard Socorro talk to patients on the phone, telling them, in substance, "if you run out give me a call, and I will get you more."  Ms. Magana saw DIAZ count out pills and give them without charge to friends of his wife.  Ms. Magana also saw Socorro give "front of line privileges" to patients who brought her gifts.

i.    DIAZ's "favorite patient" was, according to office staff, C.A., a known prostitute.  Ms. Magana saw C.A. sit on DIAZ's lap during her appointment, other staff told her they saw them kissing, and C.A. was the last patient of the day and DIAZ would send Ms. Magana home, saying he could take care of C.A.  Although C.A. received prescriptions, about three times her urinalysis came back negative.  C.A. always took one of her children into the restroom when she needed to provide a urinalysis.

60

j.   DIAZ's order for patient C.L. alarmed Ms. Magana. C.L. came in complaining of a migraine.  DIAZ ordered four drugs to be given intravenously: 30mg morphine, 4mg Dilaudid, and some combination of diazepam, Reglan, or Vistaril.  Ms. Magana refused to follow DIAZ's order, saying, "Are you serious?  This is all IV.  You're going to push it, and it's not even in an IV bag."  (Ms. Magana meant that DIAZ intended a slow push of the medication directly into C.L.'s vein, as opposed to pushing the medication into an intravenous bag of normal saline.)  DIAZ got angry and said to tell Maria LNU, a medical assistant, to do it.  Ms. Magana watched Maria draw the drugs and DIAZ pushed them into C.L.'s left arm.  C.L. came every two weeks for the same treatment.

k.   Ms. Magana remembered patient A.M.'s visit around November 15, 2011 (patient who overdosed November 25, 2011).  A.M. had a police report stating that someone stole his medication.  However, there were notes in A.M.'s chart (about three different notes) written by the receptionist stating that individuals called to report that A.M. was selling his pills.  After DIAZ gave A.M. another prescription, Ms. Magana asked DIAZ why he gave it to him

61

after they had received all the calls about A.M. selling his pills.  DIAZ replied that he couldn't take it seriously if people would not leave a name or phone number.  DIAZ also said that A.M. told him the people were lying and just trying to take his pills away.  Ms. Magana asked DIAZ if she should get DIAZ out of the room the next time someone called about anyone selling their medication so DIAZ could talk to them directly, and DIAZ replied, yes.  Ms. Magana recalled that A.M. always had red eyes when he visited DIAZ.  She overhead DIAZ taking a call from an unknown individual regarding A.M.'s death.

1.   Another troubling incident concerned patient T.P. T.P. had just been dismissed from Cottage Hospital ER where he was given 3mg Dilaudid.  The ER staff wrote in the hospital notes that T.P. was "med seeking."  When Ms. Magana relayed this information to DIAZ, DIAZ responded, "he's sick."  DIAZ gave T.P. an additional 4mg Dilaudid via IV push.  T.P.'s family called the clinic expressing their concern that DIAZ was keeping T.P. drugged up.  T.P.'s father did not want T.P. returning to DIAZ, but Ms. Magana heard from DIAZ that T.P. returned two more times that week.

m.    DIAZ used CURES and could see that patients were "doctor shopping," i.e., seeing multiple doctors at the same time in order to get prescription pain medication. The receptionist printed the CURES for all pain management patients and put it in the patient folder with suspicious items highlighted.  Although DIAZ got rid of some doctor-shopping patients, he did not do so for all.  Ms. Magana saw DIAZ prescribe narcotics to patients DIAZ knew were doctor shopping.

n.    On November 30, 2011, Ms. Magana was ill and went to urgent care.  She called the office and informed the receptionist that she would be out the rest of the week. Although she had a sick note from urgent care, when Ms. Magana showed up for work the following Monday, she was given a form stating DIAZ was letting her go for insubordination and failure to meet expectations.  When Ms. Magana called DIAZ later that day, DIAZ said he terminated her for refusing his orders on patient C.L. and talking about DIAZ behind his back.

o.    On December 6, 2011, DIAZ left Ms. Magana a voicemail message, in which DIAZ offered Ms. Magana her job back.  DIAZ said he had "a change of mind . . . after

63

listening to the girls in the office." DIAZ suggested they meet "to discuss all the issues," and informed Ms. Magana that "the issue that concerns [Ms. Magana] the most are [sic] going to go away." DIAZ explained: "Pretty much there will be no medication for sales and the people that we are treating for pain, well, I am one by one letting them go because it didn't work. I tried to help them but it didn't work that way."

## G. Arrest and Citation of DIAZ Patients L.R. and K.D.

101. On December 9, 2011, DIAZ patient L.R. was arrested by SBPD and charged with possession of a controlled substance for sale and possession of drug paraphernalia in violation of California Health and Safety Code §§ 11351, 11364, and 11375(b)(1). With L.R. at the time of his arrest was DIAZ patient K.D., who was cited for possession of drug paraphernalia in violation of California Health and Safety Code § 11364. At the time of the arrest and citation, officers found the following items:

- Two napkins with apparent pay/owe sheets for distribution of prescription pills, specifically Xanax and Dilaudid.
- Three prescription pill bottles in L.R.'s name, prescribed by DIAZ on December 8, 2011, containing methadone, Dilaudid, and Xanax.

64

- An unfilled prescription for K.D., written by DIAZ on December 8, 2011, for 90 Xanax pills with one refill and 60 Subutex pills with three refills.

- L.R.'s cell phone, which rang constantly and contained text messages from individuals "looking to meet up with [L.R.] regarding received 'Ds' [Dilaudid]."

- Drug paraphernalia, including syringes, a glass pipe, and a spoon with residue and black burn marks on the bottom.

102. L.R. waived his Miranda rights, agreed to speak with SBPD Officer Mark Corbett, and told Officer Corbett the following. L.R. had been seeing DIAZ for about a year and a half for a painful foot condition. DIAZ prescribed methadone, Dilaudid, Xanax, Adderall, testosterone, and vitamin B12. L.R. had heard that DIAZ was "pretty easy with that sort of thing," and explained that DIAZ did not ask a lot of questions and did not seem to care, and L.R. "didn't know what he wouldn't prescribe." DIAZ over-prescribed L.R., prescribing "as much as [L.R.] want[ed]." L.R. got his prescriptions refilled once a month and took about 10 Dilaudid a day. Toward the end of the month, when he ran out of Dilaudid, he used methadone.

## H.  Expert Review of DIAZ's CURES Report

103. Rick Chavez, M.D., is a Board-certified Family Practice physician and Assistant Clinical Professor at UCLA David Geffen School of Medicine in Family Medicine. Dr. Chavez is a

65

diplomate for the American Academy of Pain Management and is certified by the American Society of Addiction Medicine. Dr. Chavez was one of the first physicians in the South Bay to institute a treatment program with buprenorphine for opioid addicted chronic pain patients. Dr. Chavez currently operates his private practice, The Pain and Addiction Integrated Network, Inc., in Redondo Beach. Dr. Chavez is a Medical Consultant in Pain Management for the Board of Medical Quality Assurance Physician and Surgeon Licensure Investigative Division, for the State of California.

104. At the request of DEA, Dr. Chavez reviewed DIAZ's CURES prescribing history for the period between March 2008 and March 2011. In the time he was allotted, Dr. Chavez was able to analyze the CURES reports for 13 patients and identify 43 additional patients whose CURES data looked suspicious and needed further review. Dr. Chavez noted that he had insufficient time to complete the entire CURES data; however, the prescribing history of many more individuals appeared suspicious. Some of Dr. Chavez's conclusions are set forth below.

a. Patient V.A.: 35 year old male who received prescriptions using two name variations. Dr. Chavez noted

66

the following "major irregularities":

- Refills not consistent, regular

- Use of many different pharmacies to fill prescriptions

- V.A.'s age (under 36)

- Changing quantities and types of medications

- Excessive rate of medication usage and dangerous exposure to acetaminophen

- Pain guidelines not followed for use of long-acting medications together with short-acting medications for breakthrough pain only

Dr. Chavez concluded that there was "a strong likelihood of drug abuse, misuse, or diversion and, either physician incompetence in treating chronic pain, or active participation by the physician in assisting this individual's misuse or diversion of controlled drugs."

b.    Patient J.A.:  62 year old male who used 360 tablets every 20 to 30 days, an average of 12-18 tablets daily.  Some prescriptions were only two days apart, which indicated major drug abuse or diversion.  From February 9 to 27, 2010, J.A. received 1080 tablets of Norco, which, Dr. Chavez opined, could not be justified.  Dr. Chavez concluded that the record evidenced "drug misuse, abuse, or

67

diversion occurring as a result of either physician incompetence or physician collusion in illegal community drug distribution," and "[a] strong probability of drug diversion, misuse, or addiction."

     c.   Patient D.A.:  31 year old male.  Dr. Chavez noted the following irregularities:

- Refills not consistent, regular

- D.A.'s age (under 36)

- Changing quantities and types of medications

- Excessive rate of medication usage and dangerous exposure to acetaminophen

- Pain guidelines not followed for use of long-acting medications together with short-acting medications for breakthrough pain only

- Family member also receiving controlled drugs (patient G.A., below)

     d.   Patient G.A.:  55 year old female.  Dr. Chavez noted the following irregularities:

- Refills not consistent, regular

- Multiple unusual mixtures of pain medications; review of chart necessary to determine whether adequate and sensible approach to pain management

- G.A.'s age (over 50); concern over end organ function because of dangers associated with unusual mixture of drugs

68

- Changing quantities and types of medications

- Excessive rate of medication usage, dangerous exposure, and risk of accidental overdose

- Pain guidelines not followed for use of long-acting medications together with short-acting medications for breakthrough pain only

   e.    Patient G.A.:  42 year old male.  Dr. Chavez

noted the following irregularities:

- Refills not consistent, regular

- Use of eight different pharmacies to fill prescriptions

- Unusual combination of drugs

- Changing quantities and types of medications; large amounts within days of each other

- Excessive rate of medication usage and dangerous exposure to acetaminophen

- Pain guidelines not followed for use of long-acting medications together with short-acting medications for breakthrough pain only

   f.    Patient J.A.:  46 year old male.  Dr. Chavez

noted the following irregularities:

- Irregularity and frequency of refills

- Use of short-acting medications over World Health Organization ("WHO") recommendations.[3]

_____

   [3]  WHO recommends opiate analgesic treatment be limited to, and only offered after, a patient's failure to respond to

69

- Excessive use of benzodiazepine and opiates; overdose risk

- Changing quantities and types of medications

- Excessive rate of medication usage and dangerous exposure to acetaminophen

g.   Patient M.A.:  52 year old male, plus family member patient L.A. (62 year old female).  From April 16, 2008 to December 2, 2010, M.A. received a total of 7850 tablets of Vicodin ES, or 8.3 tablets per day.  The overexposure of acetaminophen could result in liver and/or kidney dysfunction.  Dr. Chavez noted the following irregularities:

- Refills not consistent, regular

- Use of six different pharmacies to fill prescriptions

- Suspicious for drug diversion, misuse, or addiction

- Changing quantities and types of medications

- Excessive rate of medication usage and dangerous exposure to acetaminophen

- Pain guidelines not followed for use of long-acting medications together with short-acting medications for breakthrough pain only

routine non-opiate medications and other non-medication therapies.

70

- Family member L.A. received extremely dangerous amount of Ambien, in addition to Lorazepam

    h.   Patient B.A.:  36 year old male.  Between April

9, 2008 and January 4, 2011, DIAZ prescribed a total of

21,850 tablets of Norco, approximately 22 tablets per day.

In addition, DIAZ prescribed large amounts of Oxycontin,

methadone, and oxycodone.  Dr. Chavez noted the following

irregularities:

- Refills not consistent, regular

- Use of many different pharmacies to fill prescriptions

- B.A.'s age (under 36)

- Changing quantities and types of medications

- Excessive rate of medication usage and dangerous exposure to acetaminophen

- Pain guidelines not followed for use of long-acting medications together with short-acting medications for breakthrough pain only

- Failure to follow pain management guidelines

- Average of 22 tablets of Norco per day "ridiculous and obvious evidence of drug diversion, misuse, and abuse"

    i.   Patient C.A.:  29 year old female.  Between May

8, 2008 and December 24, 2010, DIAZ prescribed a total of

71

5440 tablets of Norco, 1780 tablets of Xanax, 1100

Oxycontin 80mg, 1440 methadone 10mg, and 4020 oxycodone

30mg. Dr. Chavez noted the following irregularities:

- Refills not consistent, regular

- Use of many different pharmacies to fill
  prescriptions

- C.A.'s age (under 36)

- Changing quantities and types of medications

- Excessive rate of medication usage and dangerous
  exposure to acetaminophen

- Pain guidelines not followed for use of long-
  acting medications together with short-acting
  medications for breakthrough pain only

- "Large daily quantity of Norco and other drugs in
  a 29 year old is extremely suspicious for drug
  misuse, abuse, or diversion"

   j.   Patient C.C.:  47 year old female.  Dr. Chavez

noted the following irregularities:

- Refills not consistent, regular

- Changing quantities and types of medications

- Excessive rate of medication usage and dangerous
  exposure to acetaminophen

- Pain guidelines not followed for use of long-
  acting medications together with short-acting
  medications for breakthrough pain only

72

- Failure to follow pain management guidelines

- Average use of excessive amounts of narcotic analgesics per day "ridiculous and obvious evidence of drug abuse"

- Strong evidence of possible diversion, misuse, and abuse

k.  Patient M.C.:  27 year old female.  Dr. Chavez noted the following irregularities:

- Refills not consistent, regular

- M.C.'s age (under 36)

- Changing quantities and types of medications

- Excessive rate of medication usage and dangerous exposure to acetaminophen

- Pain guidelines not followed for use of long-acting medications together with short-acting medications for breakthrough pain only

- Failure to follow pain management guidelines

- Average use of excessive amounts of narcotic analgesics per day "an obvious example of drug abuse"

- Strong evidence of possible diversion, misuse, and abuse

l.  Patient G.L.:  54 year old male.  Dr. Chavez noted the following irregularities:

- Refills not consistent, regular

73

- Changing quantities and types of medications

- Excessive rate of medication usage and dangerous exposure to acetaminophen

- Pain guidelines not followed for use of long-acting medications together with short-acting medications for breakthrough pain only

- Failure to follow pain management guidelines

- Average of excessive amounts of narcotic analgesics per day "obvious evidence of drug abuse"

- Strong evidence of possible diversion, misuse, and abuse

- "Xyrem is a 'date rape' drug and has little place for use in clinical practice[; h]ighly abusable"

I. **My Examination of DIAZ's CURES Data**

105. On August 20, 2011, I conducted a CURES database check concerning DIAZ and the number of "hits" (i.e., filled prescriptions of controlled substances Schedules II-IV) covering the time period of March 28, 2008 through March 28, 2011. The CURES report revealed that 31,562 prescriptions for controlled substances written by DIAZ were filled. Approximately 610 of the prescriptions were for hydrocodone (approximately 2%) and approximately 4,706 were for oxycodone (approximately 15%). Approximately 1,170 of the oxycodone prescriptions were the

74

highest strength 80mg dosage units (approximately 25% of the 4,706 oxycodone prescriptions).

       a.   I also reviewed a report from a DEA database of the narcotics DIAZ ordered shipped to his medical clinic in Santa Barbara. From 2006 to 2010, DIAZ ordered the following dosage units of hydrocodone shipped to his medical clinic: 9,400 in 2006; 12,400 in 2007; 53,500 in 2008; 26,500 in 2009; and 20,700 in 2010.

106. DIAZ wrote prescriptions to 866 different patients who used 372 different pharmacies. Twelve of the patients were under the age of 21.

**V.**

**CONCLUSION**

107. Based on the foregoing, and on my training and experience, there is probable cause to believe that DIAZ has violated 21 U.S.C. § 841(a)(1), Distribution of Controlled Substances.

               /s/

               Marc A.K. Marshall, Special Agent
               U.S. Drug Enforcement Administration

Subscribed and sworn to before me on
this 29 day of December, 2011.

**JEAN P. ROSENBLUTH**

UNITED STATES MAGISTRATE JUDGE